# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DWAYNE MOORE, | ) |
| Petitioner | ) |
| v. | ) |
|  | ) Case No. 23-cv-11973 |
| DEAN GRAY, | ) |
| Respondent. | ) |

## MEMORANDUM AND ORDER

**CASPER, C. J.**                                    **January 13, 2026**

## I.      Introduction

Petitioner Dwayne Moore ("Petitioner" or "Moore") has filed this petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 ("the Petition"), alleging that: 1) the prosecutor's failure to correct false witness testimony violated Petitioner's Fourteenth Amendment rights; 2) trial counsel's failure to introduce cell phone evidence violated Petitioner's Sixth Amendment rights; and 3) the Commonwealth's withholding of exculpatory evidence violated Petitioner's Fourteenth Amendment rights. D. 1; D. 29 at 39-76. For the reasons set forth below, the Court DENIES the Petition, D. 1.

## II.      Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that a person in state custody may petition a federal court for relief on the grounds that such custody is in violation of the petitioner's constitutional rights, or the laws and treaties of the United States.

1

28 U.S.C. § 2254(a).  For a federal *habeas* court to grant relief, the burden lies with the petitioner to demonstrate that the judgment of the state court, as adjudicated on the merits, was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Section 2254(d)(1) provides two discrete paths to relief.  A state court's judgment is "contrary to" federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  The "unreasonable application" clause applies when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  Significantly, "an unreasonable application of federal law is different from an incorrect application of federal law," id. at 365 (emphasis in original), such that a state court's application of the law will not be deemed unreasonable if "'fairminded jurists could disagree' on the correctness of the state court's decision," Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Under § 2254(d)(2), factual determinations made by a state court are "presumed to be correct" unless rebutted by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in the light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  In

essence, *habeas* relief provides a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Harrington, 562 U.S. at 102-03 (internal quotations omitted). Accordingly, AEDPA "mandates highly deferential federal court review of state court holdings." Zuluaga v. Spencer, 585 F.3d 27, 29 (1st Cir. 2009). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" as § 2254(d) is "designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." Harrington, 562 U.S. at 102-03.

## III.    Relevant Factual and Procedural Background

Unless otherwise noted, the factual background set forth below is drawn from the Supreme Judicial Court's (the "SJC") decision affirming Moore's conviction. Commonwealth v. Moore, 489 Mass. 735 (2022).

### A.    <u>Commission of the Crime</u>

The charges against Moore arose out of events that occurred between the evening of September 27, 2010 and the early hours of the following morning, September 28, 2010. Moore, 489 Mass. at 736. On the evening of September 27, Moore enlisted Kimani Washington[1] to help him obtain a firearm and commit a drug-related robbery. Id. at 737. The two met at the residence of Kimani's mother on the evening of September 27, 2010, where Moore and Kimani acquired guns from Kimani's cousin, Edward, and the three subsequently took Kimani's brother's silver BMW to the site of the proposed robbery—the residence of Simba Martin ("Martin"), a drug dealer in Mattapan. Id.

---

[1] As Petitioner did in his papers, D. 29 at 3 n.1, the Court refers to Kimani and other members of the Washington family by their first names to avoid confusion.

When they arrived, Moore and Kimani exited the vehicle and sat across the street from Martin's residence, waiting for him to come outside. D. 29 at 13. To speed matters along, Moore called Martin's cell phone three times between 12:29 and 12:52 a.m. Id. at 14. Moore told Martin that he was downstairs waiting to buy marijuana. Moore, 489 Mass. at 738.

During this time, Marcus Hurd ("Hurd")—one of Martin's clients—arrived at Martin's residence in a silver Ford Edge sport utility vehicle to buy marijuana. Id. Right before he arrived, Hurd called Martin to ask him to come outside. Id. Martin was waiting for Hurd on his porch when he arrived, and he met Hurd at his car, parked a few houses down from Martin's residence. Id. The two started talking—with Martin initially remaining outside and later entering Hurd's vehicle. Id. Before Hurd and Martin had finished their transaction, Kimani approached and said, "Y'all know what time it is," which Hurd took to mean that Kimani was robbing him and Martin. Id. Kimani pulled out his gun and ordered Hurd and Martin to "get out the car" and "strip." Id. At this point, Moore joined Kimani and the two led Hurd and Martin into Martin's residence; Kimani testified that Moore did so with his firearm held to the back of Martin's head. Id. at 738-39.

When they entered Martin's residence, Levaughn Washum-Garrison ("Washum-Garrison") was asleep on the couch downstairs and Eyanna Flonory ("Flonory") was upstairs with her two-year old son. Id. at 739. Edward arrived as well, and helped Kimani and Moore load Hurd's (still running) Ford Edge with a safe, a flatscreen television, a bag and some drugs from Martin's residence. Id. Before leaving, Kimani declared: "[M]y name is Point, I'm from the Point. If they wanted to find me or get some get-back on the person that got them, they know where to find me." Id.

Moore and Edward led the rest of the group—Martin, Hurd, Washum-Garrison, Flonory and her son—out of Martin's residence and down Woolson Street.  Id.  Holding his firearm to the back of Hurd's head, Moore told him to "stop turning [his] head around," then to "walk ahead and get in the bushes," and then shot him in the back of the head, hitting his spinal cord and paralyzing him.  Id. & n.10.  A nearby Shotspotter sensor registered twelve gunshots between 1:11 and 1:13 a.m.  Id. at 740.  When Boston police officers arrived, they found all five victims in the vicinity with gunshot wounds.  Id.  Only Hurd and Flonory's son were still alive.  Id.  The latter died soon after at the hospital.  Id.

Reconvening at Kimani's mother's residence, Moore, Edward and Kimani divided the spoils of the robbery.  Id.  Kimani asked Moore why he had taken so long, and Moore explained, "We had to go back . . . [t]o kill everybody."  Id.  After "divid[ing] the goods . . . from the robbery," Kimani dropped Moore off (in the Ford Edge) near Forrest Hills in Jamaica Plain and then drove to the Grove Hall neighborhood in Roxbury.  Id. at 740-41.

The Boston Police Department ("BPD") later apprehended Kimani, who eventually confessed to the robbery and shootings and named Moore as a participant in the crime.  Id. at 741-42.  A month after his arrest, Kimani signed a cooperation agreement and also named his cousin, Edward, as a co-venturer.  Id. at 742.

When the police initially interviewed Moore, he denied any involvement in the incident, claiming he was at his residence on Morton Street at the time.  Id.  Two months later, during his second police interview, Moore maintained he had heard about the killings from the news the morning after the incident.  Id.  He also admitted that on the night of the killings, he had gone to Martin's residence.  Id.  Moore said he heard yelling and saw "tussling or whatever" through the open front door, so he walked away.  Id.  He noted hearing shots outside Martin's apartment.  Id.

5

**B. <u>State Court Proceedings</u>**

Moore was indicted on four counts of murder in the first degree, home invasion, armed robbery, assault with intent to murder, aggravated assault and battery by means of a dangerous weapon, carrying a firearm without a license and trafficking in cocaine. <u>Id.</u> On March 22, 2012, a jury found Moore not guilty of trafficking in cocaine, but could not reach a verdict as to the other charges, resulting in a second trial. <u>Id.</u>; D. 29 at 7. On December 17, 2012, a second jury found Moore guilty of: 1) four counts of felony-murder in the first degree; 2) one count of home invasion; and 3) and one count of armed robbery. <u>Id.</u> at 742-43; D. 29 at 7; Supplemental Answer ("S.A.")[2] at 371. Moore was sentenced to two consecutive life sentences without the possibility of parole. <u>Moore</u>, 489 Mass. at 743.

Moore appealed his conviction and moved for a new trial, for which the trial judge ordered postconviction discovery. <u>Id.</u> In support of his motion, Moore contended that his counsel provided ineffective assistance by failing to martial Martin's cell phone records at trial—evidence Moore contends would have exculpated him; and that the prosecutor and the Commonwealth both violated his Fourteenth Amendment right to due process by failing to correct false testimony and failing to disclose exculpatory evidence, respectively. <u>Id.</u> The trial judge held an evidentiary hearing spanning six days, after which he denied Moore's motion for a new trial. <u>Id.</u> In that denial, the court held that Moore's assertion that Martin's phone records established a different timeline of events from that developed at trial, and that Moore himself could not have been present for the crimes, was not compelled by Martin's phone records. <u>Id.</u> at 745. Martin's cell records displayed only "'[m]inor inconsistencies'" in Kimani's testimony as to the chronology of the night's events. <u>Id.</u> at 747 n.23 (internal citations omitted). The court noted that the "robbery did not unfold with

_____

[2] The S.A. appears at D. 14-1 to 14-3 on the docket.

the precision of a military operation suggested by the defendant's assertion." Id. at 745.  The court also found that Moore's assertions with respect to Kimani's Columbia Point Dogs ("CPD") affiliation were "'woefully speculative,'" and did not, as Moore argued, compel the "exculpatory inference" that Kimani committed the crimes with a CPD affiliate instead of with Moore.  Id. at 751 (quoting Commonwealth v. Moore, No. SUCR2011-10023, 2021 WL 9772075, at *3 (Mass. Super. Ct. Sept. 9, 2021)).  Moore appealed the denial of his motion for a new trial and his conviction, and SJC consolidated Moore's two appeals.  Moore, 489 Mass. at 743.

In his appeal, Moore raised six issues:  1) the trial judge erred in denying his motion for a new trial because, in failing to correct false testimony, the prosecutor violated Moore's due process rights, and his defense counsel provided constitutionally deficient assistance; 2) his counsel provided ineffective assistance by failing to use Martin's cell records, meriting a new trial, which the trial court erred in denying; 3) newly discovered call record details merited granting a new trial—the trial judge thus abused his discretion in denying Moore's new trial motion; 4) a combination of newly discovered, withheld, and originally available evidence exculpates Moore, meriting a new trial, which the judge abused his discretion in denying; 5) the prosecutor's closing statements were prejudicial for making both improper appeals to the jury's sympathies and disparaging characterizations of Moore; and 6) the trial judge abused his discretion when he denied Moore's motion to strike for cause a juror who had heard media reporting that Hurd was able to positively identify Moore as the shooter.  Id. at 743-56.  The SJC, "[a]fter a review of the entire record," found "no error warranting relief."  Id. at 756.  The SJC affirmed Moore's conviction, the order denying him a new trial, and declined to exercise its authority under Mass. Gen. L. c. 278, § 33E to reduce his degree of guilt.  Id.

With respect to the first two issues, the SJC determined that, contrary to Moore's argument, neither Martin's cell records (showing a call from Hurd to Martin at 12:40 a.m.) nor Moore's own cell site location information ("CSLI") data provided conclusive evidence that "establish[ed] a different timeline from that developed at trial," or that "cast doubt on Kimani's testimony that the defendant was present for the killings." Id. at 745, 747. The SJC concluded that, even with the admission of Martin's cell records showing that Hurd had called him at 12:40 a.m., the data was still "consistent with the robbery beginning after 12:52 a.m., when Martin's cell phone records show a call from the defendant's cell phone." Id. at 745. The SJC concluded that "[a]t best, the cell phone records potentially present additional impeachment evidence as to [Kimani's version of] the precise timeline of the events on the evening of the shooting." Id. at 745-46 (citing Commonwealth v. Kolenovic, 471 Mass. 664, 674-75 (2015)). In light of the already "'extensive impeachment based on his criminal record,'" the SJC concluded that "[t]he defendant's trial counsel was not ineffective." Moore, 489 Mass. at 746 (quoting Commonwealth v. Fisher, 433 Mass. 340, 357 (2001)). The CSLI data, too, were unpersuasive to the SJC, which found that, as the tower to which one's phone connects is "usually but not necessarily the geographically closest tower," the CSLI data did not provide conclusive evidence that Moore was not present on the night of the robbery. Moore, 489 Mass. at 748. "Significantly, the defendant's CSLI data generally supported the prosecution's theory that the defendant traveled from the vicinity of Kimani's mother's house on Fowler Street to the area around Martin's residence on the evening of the shootings." Id. Accordingly, the SJC concluded, "[t]rial counsel was not ineffective for failing to further highlight these arguably inculpatory records." Id.

Furthermore, the SJC disagreed with Moore that his counsel was ineffective for failing to use Moore's cell phone data to impeach the testimonies of Sgt. John Brown ("Brown"), Dedrick

Cole ("Cole"), and Charlene Washington ("Charlene").  Id. at 746 n.22.  Brown testified "that he found two telephone calls between [Moore] and Martin," but Moore's cell phone records in fact showed "dozens" of calls between them.  Id.  The SJC determined Moore's "[c]ounsel was not ineffective for not highlighting the extensive connection between the two."  Id.  Cole testified that Moore had called him "seeking access to a car to commit a robbery," despite Moore's call records showing no such call.  Id.  The SJC determined Moore's "[c]ounsel was not ineffective for not highlighting the absence of a record of such a call," as Cole claimed Moore called him from "a restricted telephone number" as opposed to his personal phone.  Id.  Finally, Charlene testified that Kimani had introduced her to someone ("inferably the defendant") in the early morning after the shootings, despite Moore's cell records showing two calls pinging cell towers far enough away from Charlene's residence to "suggest[] the two were not together."  Id.  The SJC noted that even if Moore's "counsel could have impeached Charlene with [Moore's] cell phone records," it "likely would not have affected the jury's verdict" as Charlene was "not a key witness."  Id.  Hence, the SJC concluded, Moore's counsel was "not ineffective" for failing to use Moore's call records to impeach these testimonies, when those call records "were in evidence and available to the jury." Id.

Further, the SJC concluded that the fact that Kimani announced that he was "from the Point" in the midst of the robbery did not provide convincing evidence that Kimani "committed the crimes with members of a gang, and not with the defendant."  Id. at 750.  Indeed, after an "'exhaustive federal-state investigation culminating in numerous indictments aimed at dismantling CPD,'" the trial judge concluded that "'the defendant fail[ed] to identify any source identifying Kimani as a member, affiliate, or in any other way connected with those involved with CPD.'"  Id. at 751 (quoting Moore, 2021 WL 9772075, at *3).  Despite detectives testifying to having

"reviewed any potential connection between Kimani and CPD in the days following the killings," the trial judge found the proposition that Kimani's statement: "'I'm from the Point,'" suggests a gang affiliation, without more, "'woefully speculative.'"  Id.  The SJC concluded that even if it were to assume "that evidence concerning the CPD gang supported exculpatory inferences, the jury were not likely to have reached a different conclusion had the evidence been admitted." Moore, 489 Mass. at 751.  Moore also argued that evidence in the form of an alert from a Boston Regional Intelligence Center ("BRIC") supports his contention that "Kimani had ties to the CPD gang," and "the gang may have been responsible for the shootings."  Id. at 751-52.  The SJC rejected this argument as well, concluding that "the [trial] judge credited the police officers' testimony that they investigated the link between Kimani and CPD and found nothing credible. Thus, the judge did not abuse his discretion in denying the motion for a new trial on this ground." Id. at 752.  The Court also concluded neither the challenges to the prosecutor's closing argument nor the allegedly improper failure to exclude juror No. 33 warranted a new trial.  Id. at 752-56. The SJC affirmed Moore's conviction and the denial of his motion for a new trial.  Id. at 756.

## C.  **This Petition**

On August 28, 2023, Moore filed this Petition pursuant to 28 U.S.C. § 2254(a), raising three grounds:  1) the SJC's denial of his claim that the prosecutor violated his Fourteenth Amendment right to due process by failing to correct Kimani's testimony, which it either knew or should have known to be false, was objectively unreasonable.  D. 29 at 59; 2) the SJC's determination that his counsel did not violate his Sixth Amendment right to effective assistance was "objectively unreasonable," id. at 53, because Martin's phone records "prove that Moore was not present for the robbery," which his counsel failed to martial in his defense.  Id. at 40; and 3) the SJC's denial of his claim that the Commonwealth violated his Fourteenth Amendment right to

due process by withholding exculpatory evidence, was both objectively unreasonable and based on an unreasonable determination of the facts.  Id. at 62; D. 43 at 27.  Moore raised all three grounds in his appeal to SJC.  Compare D. 1 at 6, 8, 9, with Moore, 489 Mass. at 743-50.

## IV.    Discussion

Moore argues he is entitled to habeas relief because, when the SJC denied Moore's new trial motion and upheld his conviction, its legal analysis was both "contrary to" and an "unreasonable application of" federal law.  D. 29 at 38; see 28 U.S.C. § 2254(d).  The Court turns to each of the Grounds that he asserts in the Petition.

### A.    Ground I:  Moore's Fourteenth Amendment claim with respect to the prosecutor's failure to correct false testimony

Moore argues the SJC acted "objectively unreasonabl[y]" when it determined the Commonwealth did not violate Moore's Fourteenth Amendment rights by failing to correct Kimani's false testimony which it either knew or should have known was false.  D. 29 at 59, 61.  Specifically, Moore claims the prosecutor's "explicit reliance on . . . Martin's, Kimani's, and Moore's cell phone records" means he was either aware or should have been aware that Kimani's testimony was false, and it was "objectively unreasonable for the SJC to characterize those records as "'not establish[ing] any "blatantly false" testimony.'"  Id. at 60-61; see Moore, 489 Mass. at 747 n.23.

### 1.    Correcting false testimony legal standard

When a prosecutor knowingly uses false evidence to obtain a conviction, he violates a defendant's Fourteenth Amendment right to due process.  See Napue v. People of State of Illinois, 360 U.S. 264, 269 (1959); see also Glossip v. Oklahoma, 604 U.S. 226, 246 (2025) (to prevail on a due process claim under Napue, "a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it 'to go uncorrected when it appear[ed]'").  A successful

<u>Napue</u> claim thus has "three elements: falsity, prosecutorial knowledge, and materiality." <u>Glossip</u>, 604 U.S. at 286 (Thomas, J., dissenting); <u>see</u> <u>United States v. Zuno-Arce</u>, 339 F.3d 886, 889 (9th Cir. 2003) (same). If a defendant meets his burden of establishing that a prosecutor knowingly used, or knowingly left uncorrected, false testimony to obtain a conviction, a new trial is required if "'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972) (citing <u>Napue</u>, 360 U.S. at 271).

**2.    The SJC's determination that the prosecutor did not violate Moore's Fourteenth Amendment rights by failing to correct Kimani's testimony was not an "unreasonable application of" clearly established law**

As to the falsity and knowledge elements, Moore argues that his, Kimani's and Martin's cell phone records, together, show that Brown's, Kimani's and Charlene's testimonies were "blatant[] lie[s]." D. 43 at 18. Moore argues that because the prosecutor "explicit[ly] reli[ed] on" the cell phone records that allegedly undermined Kimani's testimony, the prosecutor either knew or should have been aware of the falsity of Kimani's testimony. D. 29 at 62. The SJC evaluated the records Moore relies upon here and held that "the cell phone records did not establish any 'blatantly false' testimony," and that they only indicated "'[m]inor inconsistencies [that did] not constitute falsities.'" <u>Moore</u>, 489 Mass. at 747 n.23 (quoting <u>Ware</u>, 482 Mass. at 721; <u>Commonwealth v. Forte</u>, 469 Mass. 469, 491 (2014)). This legal analysis was not an unreasonable application of <u>Napue</u>, as testimony that presents "mere inconsistencies" does not meet the <u>Napue</u> standard. <u>United States v. Griley</u>, 814 F.2d 967, 971 (4th Cir. 1987); <u>see</u> <u>United States v. Hemmer</u>, 729 F.2d 10, 17 (1st Cir. 1984).

The foregoing analysis ends the <u>Napue</u> inquiry. But even if assuming *arguendo* that Kimani's testimony did satisfy the falsity element, and the prosecutor had reason to know this testimony was false, Moore's claim still fails on materiality grounds.

12

A defendant meets the materiality element where he shows "any reasonable likelihood that the false testimony could have affected the judgment of the jury."  United States v. Agurs, 427 U.S. 97, 103 (1976).  Testimony may be material where the government's case "depends almost entirely on" the testimony of that witness.  Giglio, 405 U.S. at 155.  Where a witness's testimony is presented to the jury and the defense may attack its veracity on cross-examination with evidence at its disposal, it is not material.  See United States v. Vega, 813 F.3d 386, 392-93 (1st Cir. 2016) (concluding potentially "misleading" testimony was not material where it was "easily cross-examine[d]" by defense counsel).

Here, the SJC pointed to the trial court's finding that Moore's counsel spent "extensive" time mounting an "artful" impeachment case against Kimani's character as a "career criminal."  D. 38 at 28; Moore, 489 Mass. at 746; Moore, 2021 WL 9772075, at *10, 11.  Given that the jury had been presented with Kimani's testimony, and that Moore's counsel had impeached him on cross-examination, the SJC concluded that Kimani's additional testimonial inconsistencies were not "likely to have influenced the jury's conclusion."  Moore, 489 Mass. at 747 n.23.  It was not an unreasonable application of Napue for the SJC to conclude that Moore's defense was not materially harmed by the prosecutor failing to correct additional inconsistencies in Kimani's testimony.  Vega, 813 F.3d at 392-93.  Furthermore, the Commonwealth's case did not depend "almost entirely on [one witness's] testimony."  Cf. Giglio, 405 U.S. at 154.  Other evidence— like eyewitness testimony placing someone "matching [Moore's] description" at the scene of the crime, the extensive connection between Moore and Kimani established by their phone records, Moore's "uncontrollable shaking, and sweating" when questioned by the police, as well as Moore's own statement that he was present at Martin's residence the night of the crime—all bore on the jury's decision making in convicting Moore.  D. 38 at 36.  Thus, the SJC's conclusion that

Moore's Fourteenth Amendment rights were not violated was not an unreasonable application of Napue.

### 3.    The SJC's decision also did not misapply Glossip

Moore also cites Glossip in his argument.  See D. 43 at 19-20.  In Glossip, the Supreme Court found a Napue violation when the prosecutor did not correct testimony of its star witness, and on the basis of this "only direct evidence of [petitioner's] guilt," the jury convicted petitioner. Glossip, 604 U.S. at 248.  The Supreme Court noted that "the jury could convict [petitioner] only if it believed [the witness]" since "no other witness and no physical evidence established that [petitioner] orchestrated [the victim's] murder."  Id.  Furthermore, on appeal, the State attorney general conceded constitutional error under Napue.  Glossip, 604 U.S. at 243.  The prosecutor's failure was thus material.  Id. at 250.

Glossip is distinguishable from the present case because here, there is no conceded constitutional error, and although Kimani's testimony helped the Commonwealth, it was not the only evidence bearing on guilt.  As stated above, the prosecutor introduced several other sources of evidence to remove doubt from the jurors' minds as to Moore's culpability.  Unlike in Glossip, the Commonwealth's case never rose and fell with Kimani's testimony and Kimani's testimony alone.  Accordingly, the SJC did not unreasonably apply Glossip in determining the prosecutor did not violate his Fourteenth Amendment rights by failing to correct Kimani's testimony.

### 4.    The SJC's judgement was not based upon an unreasonable determination of the facts

Moore asserts that his Napue claim was denied on grounds "unsupported by the record." D. 43 at 19.  He asserts the cell phone records and  CSLI data "demonstrates Kimani lied," D. 29 at 61, but this does "little more than again present[] the same evidence that failed to convince the state courts . . . asking us to replace their factual findings with new ones."  Gaskins v. Duval, 640

F.3d 443, 453 (1st Cir. 2011). Thus, the SJC's determination that the prosecutor's failure to correct Kimani's allegedly false testimony did not violate Moore's Fourteenth Amendment rights was not based on an unreasonable determination of the facts. Accordingly, it was not unreasonable for the SJC to conclude that the prosecutor did not violate Moore's Fourteenth Amendment rights.

### B.    Ground II:  Moore's Sixth Amendment Claim

Moore argues that it was "objectively unreasonable" for the "SJC [to have] failed to address" his arguments that:  1) his counsel "failed to marshal . . . evidence to prove that Moore was not present for the robbery," namely, Martin's cell phone records, D. 29 at 40, 52; 2) his "[c]ounsel had no strategic reason for failing to introduce" Martin's cell phone records, so the decision is owed "no deference," id. at 54, 55; and 3) counsel's failure to introduce this evidence was prejudicial to Moore, because, if it had introduced Martin's cell phone records, "there is 'a reasonable probability that . . . the result of the proceedings would have been different,'" id. at 58. Moore also argues that it was "manifestly unreasonable" for the SJC to conclude that Moore's counsel acted reasonably in failing to martial Moore's cell phone records to contest Brown, Cole, and Charlene's testimonies. Id. at 47-49.

### 1.    Ineffective assistance of counsel standard

For the purposes of *habeas* review, "[t]he Strickland standard qualifies as clearly established federal law." Janosky v. St. Amand, 594 F.3d 39, 47 (1st Cir. 2010).[3]  To establish

---

[3] The SJC reviewed Moore's ineffective assistance of counsel claim applying the "'substantial likelihood of a miscarriage of justice'" standard applicable in first degree murder convictions in Massachusetts. Moore, 489 Mass. at 744 (internal citations omitted). The First Circuit Court of Appeals has held that "[t]his statutory standard is more favorable to the defendant than the federal constitutional standard articulated by the Supreme Court in Strickland . . . or the Massachusetts constitutional standard outlined in Commonwealth v. Saferian, 366 Mass. 89 (1974)." Knight v. Spencer, 447 F.3d 6, 10 (1st Cir. 2006).

ineffective assistance of counsel under <u>Strickland</u>, Moore must show: "(1) deficient performance by counsel; (2) resulting in prejudice." <u>Yeboah-Sefah v. Ficco</u>, 556 F.3d 53, 70 (1st Cir. 2009) (quoting <u>Malone v. Clarke</u>, 536 F.3d 54, 63 (1st Cir. 2008)). When a defendant makes an "insufficient showing" on either <u>Strickland</u> prong, "a court deciding an ineffective assistance claim" need not "address both components of the injury." <u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1984). "The proper standard for attorney performance is that of reasonably effective assistance." <u>Id.</u> Thus, the inquiry is not whether counsel could have pursued an alternative, or even more customary strategy—Moore must show that his counsel's performance amounted to "incompetence under 'prevailing professional norms.'" <u>Harrington</u>, 562 U.S. at 105 (quoting <u>Strickland</u>, 446 U.S. at 690). The attorney's performance must be evaluated "considering all the circumstances." <u>Strickland</u>, 466 U.S. at 688. Even if Moore can establish deficient performance of counsel, he must still show that, absent trial counsel's failure to contest Kimani's, Brown's, Cole's and Charlene's testimony, "there is a reasonable probability that the result of the proceeding would have been different." <u>Yeboah-Sefah</u>, 556 F.3d at 70 (quoting <u>Sleeper v. Spencer</u>, 510 F.3d 32, 39 (1st Cir. 2007)).

When considering the <u>Strickland</u> standard as to a *habeas* petition, the question is not whether counsel's actions were reasonable, but instead whether there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Harrington</u>, 562 U.S. at 105. That is, "[t]he standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, . . . when the two apply in tandem, review is doubly so." <u>Harrington</u>, 562 U.S. at 105 (citations and internal quotation marks omitted).

2.    **The SJC's decision with respect to Moore's counsel's failure to martial Martin's cell records was not an "unreasonable application" of clearly established Federal law**

Moore argues it was unreasonable for the SJC to determine that his counsel did not act deficiently, because the "SJC failed to confront" that Martin's cell records "prove[d]" that "Moore was not present for the robbery," and because the SJC "adopted [the] claim" of the trial court that Moore's counsel made a strategic decision to omit Martin's cell records, despite the records providing "exculpatory value . . . [that] far outweighed any inculpatory value." D. 29 at 52, 53, 54. Moore also argues that, given his counsel's "principal strategy of undermining and discrediting Kimani's testimony," it was unreasonable for the SJC to ignore that his counsel acted "deficient[ly] by] not . . . introduc[ing] evidence that was consistent with th[at] defense." Id. at 55; D. 43 at 8. Both of Moore's arguments are unavailing. The SJC did address Moore's argument that Martin's cellphone records proved Moore was not present for the robbery. Disagreeing with Moore, the SJC determined that Martin's phone records did not necessarily disrupt the "timeline . . . developed at trial" because, as the trial judge concluded, "even with the additional detail that Hurd called Martin at 12:40 A.M.," it was still plausible that Moore was present with Kimani, and that the robbery began after Moore's final call to Martin at 12:52 a.m. Moore, 489 Mass. at 745. The SJC concluded that "at best," Martin's cellphone records "potentially present additional impeachment evidence" for Kimani's timeline of events, but noted that even as impeachment evidence, they would have provided only "marginal value." Id. at 745-46, 746 n.21.

The SJC's conclusions as to Moore's counsel's assistance were not unreasonable under Strickland and do not mandate reversal under AEDPA. The First Circuit has established that a counsel's failure to introduce impeaching evidence is not deficient when the plausibility of a witness's testimony is already assailed by ample evidence, as there is only a marginal benefit to

be gained (or only a marginal prejudice to be avoided) from his counsel introducing yet more impeaching evidence.  See Stephens v. Hall, 294 F.3d 210, 223 (1st Cir. 2002) (concluding that, where defense counsel had already "partially successful[ly]" discredited the State's only witness, there was not compelling enough prejudice to grant relief when counsel forgot to pursue a line of inquiry that would have thrown further doubt on her credibility, even when "the prosecution's case depended almost entirely on [her] credibility"); Gonzalez-Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001) (noting that "a significant factor weighing in favor of finding prejudice is the absence of any corroborating evidence other than the testimony" of the State's witnesses).  Here, the SJC determined Kimani had already been "'subjected to extensive impeachment based on his criminal record and based on various changes in the different versions of events he had given.'" Moore, 489 Mass. at 746 (internal citation omitted).  That Moore's counsel had already presented "'extensive'" evidence undermining the credibility of Kimani's testimony led the SJC to conclude that Moore's counsel's failure to "'pursue additional avenues of impeachment d[id] not constitute ineffective assistance.'"  Id. (quoting Fisher, 433 Mass. at 357).  This conclusion is consistent with First Circuit precedent, and was not an unreasonable application of Strickland.

Moore's reliance upon York v. Ducart, 736 F. App'x 628 (9th Cir. 2018) is misplaced.  In York, the Ninth Circuit concluded that a counsel's performance was deficient because he failed to introduce phone records that were "significantly exculpatory" since they contradicted the testimony of the prosecution's key witness without whom the State's case would have been "'only weakly supported by the record.'"  York, 736 F. App'x at 629-31 (quoting Strickland, 466 U.S. at 696).  Here, Martin's cell phone records have no such value.  The SJC found that the cell records did not necessarily contradict Kimani's timeline of the robbery.  See Moore, 489 Mass. at 746 n.21.  Hence, introducing Martin's phone records would not "have 'alter[ed] the entire evidentiary

18

picture,'" as in York, and it was consequently not unreasonable for the SJC to conclude that the failure of Moore's counsel to introduce Martin's cell phone records was not constitutionally deficient performance.  York, 736 F. App'x at 632 (citing Strickland, 466 U.S. at 692).

For the aforementioned reasons, the SJC did not unreasonably apply clearly established Federal law when it determined that Moore's counsel did not provide ineffective assistance by failing to martial Martin's cell phone records.

> **3.    The SJC's decision with respect to Moore's counsel's failure to contest the testimonies of Brown, Cole and Charlene not an "unreasonable application" of clearly established Federal law**

Moore also argues that it was "objectively unreasonable" for the SJC to conclude that his counsel did not provide defective assistance because failing to contest Brown, Cole and Charlene's testimonies amounted to deficient performance, and was prejudicial "[g]iven the lack of reliable corroboration of Moore's participation in the crime."  D. 29 at 56, 58.

As to Brown's testimony that Moore and Martin communicated only twice in the month of September, the SJC concluded that Moore's "[c]ounsel was not ineffective for not highlighting the extensive connection between" them.  Moore, 489 Mass. at 746 n.22.  Moore's phone records, in fact, showed dozens of calls between the two.  Impeaching Brown's testimony may thus have strengthened Moore's connection to the victim of the shooting, and the SJC determined it was not ineffective for Moore's counsel to avoid highlighting that connection.  This conclusion was not an unreasonable application of Strickland because it is within the "wide latitude" of a counsel's "tactical decisions" to avoid drawing attention to the connection between Moore and the victim, which may have bolstered the Commonwealth's case.    See Strickland, 466 U.S. at 689.  Furthermore, the SJC noted the jury had access to Moore's phone records, Moore, 489 Mass. at 746 n.22, which would have already shown the extent of the connection between Moore and

Martin.  Sanchez v. Alvarez, 770 F. Supp. 3d 386, 392 (D. Mass. 2025) (finding counsel's performance not deficient for failure to introduce a video in slow motion where the jury had already been given a copy of the full-speed version and "could have chosen to slow down if they wished"). It was thus not unreasonable for the SJC to determine that Moore's counsel did not provide ineffective assistance by failing to martial Martin's phone records to contest Brown's testimony.

But even if Moore's counsel's assistance did rise to deficient performance under Strickland, Moore's claim would still fall because his counsel's failure to contest Brown's testimony did not amount to prejudice.  When the potential prejudice flows from a failure to impeach a government witness, the Court must consider: 1) the strength of the government's case against the defendant; 2) the strength of the defense's case without the impeachment evidence; and 3) the impeachment value of the evidence in undermining "the credibility of the government witness's testimony."  Gonzalez-Soberal, 244 F.3d at 278; Stephens, 294 F.3d at 218.

As to the first factor, the Commonwealth presented several pieces of evidence to establish Moore's guilt, including Moore's phone records, which showed "approximately twenty calls" between him and Kimani, Moore's CSLI data placing him "generally . . . close in location to Martin's house on the night of the shooting," Moore's own admission that he had gone to Martin's house on the night of the shooting, a police officer's testimony that Moore was "uncontrollabl[y] shaking and sweating" when he first approached him, as well as eyewitnesses whose descriptions of the gunman matched Moore's physical characteristics.  D. 34 at 36.  This evidence made the Commonwealth's case stronger than if it were only held together by Kimani's uncorroborated testimony. Gonzalez-Soberal, 244 F.3d at 278 (noting that prejudice is more likely to be found in the "absence of any corroborating evidence other than the testimony" in question).  As to the second and third factors, Brown's testimony was central to neither the Commonwealth's nor the

defense's case.  As explained above, the SJC found that Moore's counsel had already mounted a "skillful" and "extensive" attack on Kimani's character, Moore, 2021 WL 9772075, at *10, 11; Moore, 489 Mass. at 746, which would have rendered further impeachment "cumulative of the evidence the jury heard at trial."  Ayala v. Alves, 85 F.4th 36, 60 (1st Cir. 2023).  Moore's cell phone records were introduced in evidence and reflected the dozens of calls between Martin and Moore that Moore argues his counsel deficiently failed to use in his defense.  See Moore, 489 Mass. at 746 n.22.  Accordingly, both of these factors cut against finding prejudice.  Accordingly, Moore was not prejudiced by his counsel's failure to contest Brown's testimony.  Gonzalez-Soberal, 244 F.3d at 278.

As to Cole's testimony, the SJC concluded Moore's counsel's failure to highlight the lack of a record of a call between the two was "not ineffective," as Cole was able to explain the missing registration of Moore's call.  Moore, 489 Mass. at 746 n.22.  It was not an unreasonable application of Strickland for the SJC to conclude that Moore's counsel was not ineffective in failing to contest Cole's testimony.  Proceeding to the prejudice analysis for Cole's testimony is similarly unsuccessful.  As discussed above in reference to Brown's testimony, the first factor here weighs in the Commonwealth's favor, and thus against finding prejudice.  As to the second and third factors, Cole's credibility, like Brown's above, was peripheral to both the Commonwealth's and the defense's case.  Accordingly, both of these factors cut against finding prejudice.  Thus, it was not unreasonable for the SJC to conclude that Moore was not prejudiced by his counsel's failure to impeach Cole's testimony.  Gonzalez-Soberal, 244 F.3d at 278.

Finally, as to Charlene's testimony, the SJC determined that even though Moore's counsel could have used Moore's phone records to impeach her testimony, "Charlene was not a key witness, and impeaching her likely would not have affected the jury's verdict."  Moore, 489 Mass.

at 746 n.22.  Despite reaching its conclusion only on the basis of lack of prejudice, the SJC "need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  Strickland, 466 U.S. at 670. Since the Strickland standard is an "or" test, failing either the deficient performance prong, or the prejudice prong "defeats the ineffectiveness claim."  Id. at 700.  Noting the jury was unlikely to have reached a different verdict as a result of impeaching Charlene, the SJC concluded Moore's counsel was not ineffective in failing to contest her testimony.  Moore, 489 Mass. at 746 n.22.  It was not an unreasonable application of Strickland for the SJC to determine as much.  For the aforementioned reasons, the SJC's conclusion that Moore's Sixth Amendment rights were not violated was not unreasonable.

### C.    Ground III:  Moore's Fourteenth Amendment claim with respect to the Commonwealth withholding exculpatory evidence

Moore argues the SJC both unreasonably applied Brady v. Maryland, 373 U.S. 83 (1963) and made an unreasonable determination of the facts when it concluded the Commonwealth did not violate Moore's Fourteenth Amendment right to due process by suppressing evidence of Kimani's affiliation with CPD, as well as a BRIC report suggesting Kimani's ties to the gang.  D. 29 at 62, 67-69.

#### 1.    Withholding exculpatory evidence legal standard

A defendant's Fourteenth Amendment right to due process is violated when a prosecutor suppresses "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment."  Brady, 373 U.S. at 87.  This is so "irrespective of the good faith or bad faith of the prosecution."  Id.  A "true Brady violation" has three components:  1) the undisclosed evidence must be "favorable to the accused, either because it is exculpatory or because it is impeaching"; 2) the undisclosed evidence must have been "suppressed by the State, either

willfully or inadvertently"; and 3) the defendant must have been "prejudice[d]" by the suppression. Strickler v. Greene, 527 U.S. 263, 281-82 (1999).[4]

### 2.    The SJC's decision that Moore's Fourteenth Amendment rights were not violated was not an "unreasonable" application of Brady

As to the first two Brady prongs, favorability and suppression, although Moore argues that both Kimani's statement, "I'm from the Point," and the BRIC report were exculpatory and suppressed by the Commonwealth, he does not present an argument that the SJC unreasonably applied Brady when it concluded the opposite. To the contrary, the SJC, in evaluating Moore's claim, credited the trial court's finding that Kimani's statement, "'I'm from the Point,' without more," was insufficient proof of Kimani's affiliation with CPD to be exculpatory. Moore, 489 Mass. at 751 (quoting Moore, 2021 WL 9772075, at *3). The SJC noted Moore could not "'identify any source identifying Kimani as a member, affiliate, or in any other way connected with those involved with CPD.'" Id. BPD officers also testified during the state court motion hearing that, despite investigating "Kimani's ties to CPD in the days following the shootings... [they] did not find any information linking" the two. Moore, 489 Mass. at 751. After review, the SJC credited the trial court's finding that the evidence was "'woefully speculative'" of Kimani's CPD affiliation. Moore, 489 Mass. at 751 (quoting Moore, 2021 WL 9772075, at *3). It was neither contrary to, nor an unreasonable application of Brady for it the SJC to do so.

---

[4] Moore argues he is entitled to de novo review of his Brady claim because "the SJC did not make a finding" as to the first two prongs. D. 43 at 21. Habeas petitioners are entitled to de novo review of claims not reviewed in state court on their merits within the meaning of 28 U.S.C. § 2254. DiBenedetto v. Hall, 272 F.3d 1, 7 (1st Cir. 2001). When a state court evaluates a claim under a standard that is "'more favorable to defendants than the Federal Constitutional standard,'" the federal law adjudication is presumed "to be subsumed within the state law adjudication." McCambridge v. Hall, 303 F.3d 24, 35 (1st Cir. 2002) (quoting Commonwealth v. Tucceri, 412 Mass. 401, 413 n.11). Here, the SJC cited Tucceri—containing a more defendant-friendly standard—in dispensing with Moore's prejudice claim. Moore is thus not entitled to de novo review. Tucceri, 412 Mass. at 413 n.11.

As to <u>Brady</u>'s third prong, prejudice, Moore argues "the SJC ignored that the jury reasonably could have concluded that Kimani committed this crime on behalf of CPD." D. 43 at 27. According to Moore, the suppressed evidence prejudiced him because it undermined Kimani's motive for committing the crime, given Kimani was the "'linchpin' of the Commonwealth's case," and his already having "major credibility issues." D. 29 at 70. Moore also argues he was prejudiced because the suppressed evidence suggested detectives had "prematurely abandoned" their investigation of CPD involvement in the crimes. D. 29 at 73. Moore asserts the suppressed evidence would thus have strengthened his <u>Bowden</u> defense "dramatically," undermining his participation in the crime. <u>Id.</u> Finally, Moore argues he was prejudiced because the undisclosed evidence hampered his counsel's investigation, which would have included the "gang theory described above and developed third-party culprits." <u>Id.</u> at 75.

The SJC applied the more defendant-friendly <u>Tucceri</u> standard and concluded that even if the evidence were exculpatory, the jury would have been unlikely to reach a different conclusion if presented with the undisclosed evidence. <u>See</u> <u>Moore</u>, 489 Mass. at 751. The SJC also considered Moore's <u>Bowden</u> defense argument and concluded that, since the lower court judge had credited the testimony of one of the detectives "assigned to a task force specifically investigating CPD," any support for Moore's claim would "likely have been minimal at best." <u>Id.</u> The same was true, the SJC held, of the BRIC reports, which "might have provided nominal support for the defendant's <u>Bowden</u> defense." <u>Id.</u> at 752. "It is a daunting task for a habeas petitioner to show that a considered opinion by the state's highest court is objectively unreasonable when that court has made an evaluative judgment, based on the entire record and applying the correct legal standard, that the petitioner has not met the <u>Brady</u> standard for prejudice." <u>Healy v. Spencer</u>, 453 F.3d 21, 27 (1st Cir. 2006). So too, here. The SJC made a determination, supported by the record,

24

that Moore was not prejudiced by the undisclosed information.  As discussed above, the SJC considered Moore's prejudice claim, applied a more defendant-friendly standard in evaluating it, and concluded he was not prejudiced by the suppressed evidence.  It was not an unreasonable application of Brady for it to have done so.[5]  For the foregoing reasons, when the SJC concluded the Commonwealth did not violate Moore's Fourteenth Amendment rights, it did unreasonably apply clearly established Federal law.

## V.    Conclusion and Certificate of Appealability

For the foregoing reasons, the Court DENIES the Petition, D. 1.  A petitioner may receive a certificate of appealability only if he "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A certificate of appealability is appropriate when "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Miller-El, 537 U.S. at 338 (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).  Based upon the analysis of the record and the applicable law in this Memorandum and Order, the Court does not, at this juncture, conclude that reasonable jurists would find its conclusion denying the Petition debatable or wrong.  The Court, therefore, is not inclined to issue a certificate of appealability but will give Moore until February 10, 2026 to file a memorandum if he seeks to address the issue of whether a certificate of appealability is warranted as to the Petition.

So Ordered.

/s Denise J. Casper
Chief United States District Judge

---

[5] In his reply, Moore argues further that the "SJC's findings relative to the CPD evidence were unreasonable" because the SJC altered a word from the reproduced BRIC report.  D. 43 at 27; S.A. 1663.  Not only did Moore waive this argument by raising it for the first time on reply, see Bendix Autolite Corp. v. Midwesco Enters., Inc., 486 U.S. 888, 895 (1988), but he fails to meet his burden of demonstrating that the alteration, noted in brackets by the SJC to indicate the substitution, was unreasonable under § 2254 (d)(2), as his assertion is conclusory, unsupported by the legal standards § 2254 (d)(2) imposes.

25